567 So.2d 461 (1990)
STATE of Florida, Appellant,
v.
Patricia PARRISH and Jacqueline Paige Parrish, Appellees.
No. 89-1508.
District Court of Appeal of Florida, First District.
August 30, 1990.
Rehearing Denied January 2, 1991.
*462 Robert A. Butterworth, Atty. Gen., Mitchell D. Franks, Deputy Atty. Gen., and Edward C. Hill, Jr., Asst. Atty. Gen., Tallahassee, for appellant.
Alan C. Sundberg, Gary L. Sasso, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tallahassee, Edward S. Stafman, of Stafman & Friedlander, Tallahassee, for appellees.
JOANOS, Judge.
The state appeals an order of the trial court which dismissed an information filed against Patricia Parrish and Jacqueline Paige Parrish. The information charged the Parrishes with making false statements on homestead exemption applications, and with grand theft in connection with taxes alleged to be due on property determined ineligible for homestead exemption. The state contends the order of dismissal errs in four respects: (1) in imputing the property appraiser's motives to the prosecutor, (2) in determining that the referral for prosecution was improperly motivated, (3) in determining that the Parrishes were prosecuted when similarly situated persons were not, and (4) in determining that the Parrishes were improperly selected for prosecution. We affirm.
Charges were filed in this case contemporaneously with a 1988 political campaign in which appellee Patricia Parrish was the Democratic candidate for the office of Leon County Property Appraiser, against the incumbent Republican C.C. "Dick" Brand. The trial court found that public opinion polls conducted in the early part of October 1988 indicated that the race would be close. The record reflects that during the campaign, based on information furnished by a subordinate in his office, Brand concluded that Patricia Parrish and her daughter, Paige Parrish, had violated the homestead exemption laws. On the basis of this conclusion, Brand arranged a meeting with Willie Meggs, State Attorney for the Second Judicial Circuit. Meggs decided to investigate, and turned the matter over to his chief investigator who, in turn, assigned an investigator to the case.
On October 19, 1988, two days after the meeting in the state attorney's office, the investigator presented his findings to Meggs. That same day, Meggs decided to seek arrest warrants. The probable cause affidavits prepared to support issuance of the arrest warrants indicate the investigation was conducted upon the sworn complaint filed by the office of the Leon County Property Appraiser. The warrants were obtained, and the Parrishes were arrested and booked at the Leon County jail on misdemeanor charges of making false statements on their homestead exemption form.
After the prosecution commenced, the state attorney offered a plea agreement in which the state agreed to drop the charges against Paige Parrish, provided Patricia Parrish pled nolo contendere to one count of making a false statement on a homestead exemption form and paid a $250 fine. Patricia Parrish declined the plea offer. Thereafter, the state attorney filed an amended information charging the Parrishes with the felony offense of grand theft, in addition to the original false statement charges. The grand theft charge was based on the accumulation of lost tax revenues for the years in which the Parrishes allegedly filed false homestead exemption claims. With the added felony count, the case was transferred from county court to circuit court.
The false homestead exemption allegations relate to two townhouses purchased in August 1983 by Lance and Paige Parrish, with their parents as half owners. The Parrish children then became fulltime occupants of their respective units. On February 14 and 15, 1984, the Parrish children made application for and were granted fifty percent homestead exemptions, based *463 upon their fifty percent interest in their homes. In 1985, Patricia Parrish signed the renewal forms for her children; in 1986, Patricia Parrish signed the renewal card for Paige's unit, and Lance signed the renewal card for his unit; in 1987, Patricia Parrish signed the renewal card for both units; in 1988, Patricia Parrish signed the renewal form for Lance's unit, and Paige signed the renewal form for her unit. Each renewal application sought only to renew the children's fifty percent exemptions.
The matter came to the attention of the property appraiser's office when Lance Parrish sold his townhouse in 1988, shortly before Patricia Parrish commenced her campaign against Brand. A copy of the deed was transmitted to the property appraiser's office for correction of the records to reflect the new owner's name, and for deletion of homestead exemption status. The new owner of property entitled to homestead exemption must claim the exemption in his or her own name, to have homestead status reinstated. See § 196.031(1), Fla. Stat. (1987). Upon receipt of the conveyance of Lance Parrish's town-house, the employee responsible for correcting the property appraiser's records noted that it was owned by Lance, Patricia, and Bernard Parrish. Because Patricia Parrish was one of the owners, and because the employee knew Patricia Parrish did not live at the property, the record reflects she reported the matter to the deputy property appraiser. In so doing, the employee by-passed the normal office procedure, in which she would have taken questions to her immediate supervisor rather than to the deputy supervisor, Brand's second in command. The deputy property appraiser reviewed computer information on the property, and then began an investigation of the Parrishes.[1]
The investigation conducted by the property appraiser's office revealed that although homestead renewal applications were filed on Lance Parrish's townhouse for the years 1986 through 1988, Lance Parrish moved out of the townhouse in June 1986; thereafter, the property was rented. The investigation further revealed that although Paige Parrish continued to claim a fifty percent homestead exemption, she moved out of her townhouse in August 1985, and this property was rented also. The property appraiser's office completed its investigation of the Parrishes in two to three working days, and then turned the matter over to the state attorney's office.
Initially, the state attorney was given the impression that Patricia Parrish had claimed three homestead exemptions for herself. Subsequently, however, the property appraiser maintained the exemptions were claimed improperly because the property had been rented. Section 196.061, Florida Statutes,[2] generally known as the "rental abandonment statute," provides that rental of property formerly claimed as homestead constitutes an abandonment of the homestead exemption. Brand acknowledged that the statute is not well known, and indeed the record reflects that after this case was filed, the property appraiser's office instituted proceedings to acquaint property owners with this provision of the homestead exemption law.
It is undisputed that until charges were filed against the Parrishes, no one in Leon County had been charged with a violation of section 196.131(2), Florida Statutes,[3] or with grand theft related to a charge of *464 providing false information on a homestead exemption form. The record reflects the state attorney was cognizant of this historical fact, and also was aware of the political race between Patricia Parrish and Brand. Nevertheless, the record also reflects he did not inquire into the reasons the Parrishes were being referred for prosecution when no other persons had been so referred.
The record further reflects that the investigation undertaken by the state attorney's office was completed in twenty-eight hours. An attorney employed by the property appraiser's office was assigned to assist the state attorney's office in the investigation. The Parrishes were arrested on October 19, 1988, two days after Brand's meeting with the state attorney, and less than three weeks before the general election on November 8, 1988. No one in the state attorney's office spoke with the Parrishes prior to the arrest, although the state attorney acknowledged that sometimes suspects are contacted to ascertain their version of a matter before an arrest is made. When asked why he decided to arrest in this case, rather than serve the summons or notice to appear normally employed with regard to misdemeanors, Meggs said that he considered the severity of the situation warranted a determination by a neutral magistrate.
The record also reflects that the state attorney's office has a policy of reacting to complaints filed by other agencies, rather than initiating prosecutions. Meggs stated that his charging decisions are based on the reasonable likelihood of obtaining a conviction.
In November 1988, the Parrishes filed a motion to dismiss, alleging, among other things, that the decision to prosecute constituted a violation of their equal protection and due process rights under the federal and state constitutions. On April 10, 1989, the Parrishes filed a second motion to dismiss predicated upon allegations of selective prosecution in violation of the due process clause. After a hearing to determine whether the Parrishes were entitled to an evidentiary hearing on their selective prosecution claim, the trial court issued an order finding that they had established a "colorable entitlement" to raise the defense of selective prosecution, and were entitled to an evidentiary hearing on this claim.
Following the subsequent evidentiary hearing which extended over three days and involved eighteen witnesses, together with numerous exhibits, the trial court found that appellees established the elements of their selective prosecution defense. The state concedes that the trial court recited the appropriate standard for determining selective prosecution claims, but maintains the trial court misinterpreted and misapplied the test in this case. We disagree. In a well reasoned and carefully explicated order, the trial court determined that the Parrishes were singled out for prosecution while other similarly situated persons were not, and that Brand's decision to refer the case for prosecution was motivated by political considerations. The trial court further found that since the state attorney has no policy regarding the filing of criminal charges in cases involving homestead exemption violations, the property appraiser effectively made the charging decisions, and his motives in doing so are attributable to the state attorney. Finally, in recognition of the deference due a prosecutor's charging decision and that "the decision to prosecute is particularly ill-suited to judicial review," see Wayte v. United States, 470 U.S. 598, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985), the trial court concluded that a defendant claiming a selective prosecution defense should be required to establish such defense by clear and convincing evidence.
The burden of going forward with a motion to dismiss rests upon the accused, who must allege under oath that the material facts are undisputed, describe the material undisputed facts, and demonstrate that the undisputed facts fail to establish a prima facie case, or that the facts establish a valid defense. Fla.R.Crim.P. 3.190(c)(4); Ellis v. State, 346 So.2d 1044 (Fla. 1st DCA), cert. denied, 352 So.2d 175 (Fla. 1977); State v. Anderson, 536 So.2d 1166 (Fla.2d DCA 1988). In reviewing a ruling on a motion to dismiss, the appellate court *465 is required to view the evidence in a light most favorable to the state. State v. Davis, 243 So.2d 587, 591 (Fla. 1971); State v. Mattox, 441 So.2d 648, 650 (Fla. 1st DCA 1983). Thus, unlike the standard employed at trial when the jury considers the evidence, all inferences attendant upon the evidence offered in support of a motion to dismiss will be resolved against the defendant. Id.
The test for selective or discriminatory prosecution has been stated thusly:
To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.
United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir.1974). See also Wayte v. United States, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); United States v. Aguilar, 871 F.2d 1436, 1474 (9th Cir.) amended and superseded on other grounds at 883 F.2d 662 (9th Cir.1989), petition for cert. filed Dec. 1, 1989; U.S. v. Bassford, 812 F.2d 16, 19 (1st Cir.), cert. denied, 481 U.S. 1022, 107 S.Ct. 1909, 95 L.Ed.2d 514 (1987).
The first part of the test requires a showing that the defendant was prosecuted while others similarly situated were not. Bassford, 812 F.2d at 20. See also Wayte, 105 S.Ct. at 1531; United States v. Gordon, 817 F.2d 1538 (11th Cir.1987), cert. dism.; 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 979 (1988); United States v. Schmucker, 815 F.2d 413 (6th Cir.1987). In other words, the defendant must demonstrate that he or she is a member of an identifiable group or class. In this vein,
[t]he similarly situated group is the control group. The control group and the defendant are the same in all relevant respects, except that defendant was for instance, exercising his first amendment rights. If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination.
Aguilar, 871 F.2d at 1474. Examples of similarly situated or control groups discussed in Aguilar include persons who refuse to pay taxes and persons who refuse to complete census forms. Thus, prosecution of only those who express vocal opposition to taxes or to the census would give rise to a claim of selective prosecution. Aguilar, 871 F.2d at 1475.
Aguilar concerned the prosecution of members of the sanctuary movement for violation of the immigration laws. In that case, the defendants urged the court to adopt a narrow definition of similarly situated immigration law violators to include only those persons not profiting economically or physically exploiting aliens. As the Aguilar court found, the defendants' argument hinged on their assertion that they were similarly situated to ranchers and farmers, but not to organized smuggling rings operating for profit. The court disagreed, finding that appellants' definition of similarly situated did not insure that all distinctions extraneous to first amendment expression are removed. The appellants' suggested definition excluded the one class of immigration law violators with whom they had most in common: organized smugglers operating for financial gain. The Aguilar court then found that organized smugglers represented a perfect control group, because they present a similar threat to immigration policy in terms of the numbers of aliens they smuggle, although they do not engage in vocal opposition to the policy which appellants claim motivated the prosecution. The court noted that appellants' suggested definition sought to distract attention from the fact that the government does in fact prosecute organized alien smugglers, albeit organized smugglers seeking financial gain rather than for religious purposes. 871 F.2d at 1476.
*466 In a similar vein, in Schmucker, the court rejected the defendant's contention that he was prosecuted for refusal to register for the draft solely because of his religious beliefs. The court found that Schmucker was prosecuted because he belonged to that class of non-registrants who reported themselves, or were reported by others. In other cases of non-registrants, claims of prosecution due to vocal opposition were likewise rejected, again on grounds that those appellants belonged to the larger class known to the government, who made known their refusal to register. See, e.g., Wayte.
In this case, the state has attempted to narrow the similarly situated class in a manner akin to that attempted by members of the sanctuary movement in Aguilar. Here, the state would have the court fashion a similarly situated class of homestead violators that would include only political figures in Leon County who were prosecuted for homestead exemption violations. This we decline to do because we regard seeking public office as the exercise of a constitutional right. Instead, we find that the Parrishes are similarly situated with that group of persons in Leon County who made false statements on their homestead exemption applications, or with the narrower group within the total "false statement" group whose false statements concerned rental property rendered ineligible for the homestead exemption by virtue of the rental abandonment statute. Under the first similarly situated class, the Parrishes demonstrated that of the eighty-four homestead exemption denials from 1984 through 1988, theirs was the first case in Leon County in which a criminal prosecution was pursued for making false statements on a homestead exemption application.
We turn now to the more select similarly situated class of denials predicated on the fact that property formerly eligible for homestead exemption had been rented. We have limited our analysis of this class to the 1987-1988 period when Brand served as Leon County Property Appraiser. The evidence reflects that none of the 1987 denials involved the rental abandonment statute. However, in 1988, seven denials, in addition to the Parrish application, were predicated on a determination that property formerly eligible for homestead was being rented. Four of these denials occurred prior to the July 1 cut-off date for denying homestead applications. See § 196.151, Fla. Stat. (1987). The other three denials, like that of the Parrishes, occurred after the July 1 cut-off date. Of particular note is the fact that one denial is dated September 27, 1988, some three weeks prior to the Parrish denial, yet criminal charges were not filed in that case.[4] The record reflects that after the charges were filed in this case, other persons were arrested on charges of homestead exemption violations.
In addition to its narrow class argument, the state cites Taylor v. United States, 798 F.2d 271 (7th Cir.1986) cert. denied, 479 U.S. 1056, 107 S.Ct. 933, 93 L.Ed.2d 983 (1987), for the proposition that late prosecution of others similarly situated will preclude a selective prosecution defense. In Taylor, the selective prosecution claim was considered post-trial, because the defendant (a black man) had no reason to believe prior to that time that his co-defendant (a white man) would not be prosecuted. By the time the appeal was decided, the co-defendant had been indicated and prosecuted, albeit belatedly. The court found that since Taylor could no longer claim that others similarly situated had not been prosecuted, his claim failed.
It appears the Taylor decision is inapposite in the context of this case. First, due to its unique procedural and factual circumstances, it appears Taylor should be limited to its facts. Further, the Supreme Court has held that an after-the-fact legitimate reason for a decision is not sufficient if that reason was not the motivating factor at the time of the decision. Price Waterhouse v. Hopkins, 490 U.S. 228, 109 *467 S.Ct. 1775, 104 L.Ed.2d 268 (1989); Givhan v. Western Line Consolidated School District, 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).
The second part of the selective prosecution test requires a showing that the discriminatory selection of the defendant for prosecution has been invidious or in bad faith, in that it rests upon such impermissible considerations as race, religion, or the desire to prevent the exercise of political rights. Wayte; Gordon. To demonstrate discriminatory purpose, a defendant must establish that (1) he was singled out for prosecution although the government was aware that others had violated the law, and (2) the government had followed unusual discretionary procedures in deciding to prosecute. Greene, 697 F.2d at 1236; analyzing U.S. v. Falk, 479 F.2d 616 (7th Cir.1973), and U.S. v. Steele, 461 F.2d 1148 (9th Cir.1972). In determining whether "a defendant has established selective prosecution, a court must undertake `a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" Gordon, 817 F.2d at 1541.
To establish the second part of her selective prosecution defense, it was incumbent upon Patricia Parrish to show that the decision to prosecute was based on a desire to prevent her exercise of constitutional rights, i.e., the right to run for public office. See CBS, Inc. v. F.C.C., 453 U.S. 367, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Evidence in this regard includes the long-standing policy of the property appraiser's office to deal with homestead violations administratively, together with the fact that this was the first prosecution of its kind in Leon County. Although Brand had held the office of property appraiser only a year when the decision to prosecute was made, the record reflects as a thirty year employee of the office, he was aware of the policy. Moreover, although Brand testified that he had discussed policy changes with his staff, he had initiated no policy changes during his year in office. In addition, the decision to prosecute was remarkable in terms of the manpower devoted to expedite the investigation, the fact that the investigation was complete in two to three working days, and the decision to take the case directly to the state attorney. Although Brand and his assistant acknowledged that the fifty percent homestead exemption claimed by the Parrish children was entirely proper, initially, it was represented to the state attorney and to the press that Patricia Parrish had claimed three homestead exemptions for herself. Subsequently, the property appraiser relied on the rental abandonment statute, section 196.061, Florida Statutes (1985), as justification for the decision to prosecute. The trial court noted that a prominent local attorney testified that he had never heard of the rental abandonment statute. Brand also acknowledged that the statute was not generally known, and indicated he had taken steps to remedy that situation, albeit after the fact with regard to the Parrishes. The trial court also remarked as to the inconsistency between Brand's indignation at Patricia Parrish's conduct, predicated on Brand's view that as a realtor she possessed superior knowledge, and the fact that among the unprosecuted violators were other realtors and lawyers who presumably possessed the same superior knowledge.
Suffice it to say that viewing the evidence in a light most favorable to the state, while at the same time recognizing the trial court's role in determining witness credibility, we find the record contains competent substantial evidence to support the trial court's finding that the decision to refer the Parrishes for prosecution was politically motivated. In other words, politics was the factor that initiated the new policy in the Leon County Property Appraiser's office.
By the same token, we conclude the trial court's imputation of the motive to the state attorney was proper in the unique circumstances of this case. In making this determination, we expressly reject the state's argument, founded on Wayte, that the state attorney served as a neutral barrier between the Parrishes and the property appraiser's discriminatory purpose. In *468 the instant case, the trial court found that Meggs performs the duties of his office in a "reactive" manner. That is, he does not initiate investigations or prosecutions. Rather, he acts on cases brought to him if, in his judgment, probable cause to prosecute exists and if he thinks a conviction can be obtained. Meggs testified that he had never before prosecuted a case of alleged homestead violation, and that he would not initiate such a case  he would act only on those cases referred by the property appraiser's office. The trial court accepted as true that Meggs did not relish his involvement in this case, but concluded that the passive-reactive manner in which Meggs approaches such charging decisions warrants imputation of Brand's motivation to the prosecutor. The record supports that determination.
In summary, based on our examination of the record and the legal principles applicable to a claim of selective prosecution, we conclude the trial court could lawfully determine that the Parrishes were singled out for prosecution for political reasons. Accordingly, the appealed order is affirmed.
SMITH, J., concurs.
WENTWORTH, J., dissents with opinion.
WENTWORTH, Judge, dissenting.
I would conclude on this record under the cited precedent that political factors did likely affect the initiation of prosecution in this case, but those political factors did not include an invidious intent by the incumbent tax officer to deter the fair exercise of protected rights. The political factors instead were an unfortunate coincidence between the election calendar, the cyclical nature of the property tax process, and the incumbent's unavoidable choice, between potential charges of vindictive action and improper inaction, when he learned of an opposing candidate's personal infraction. Late in the campaign the facts came to light in the ordinary course of office routine during the first year this official (a former employee) had authority to set new policy on such violations. And the particular infraction, a claim of homestead residence on property long occupied by tenants, seems to me to be patently deceptive and improper whether or not a statute so providing was known or even in existence. Lacking an imputed bad motive, the prosecutor's apparent policy of inertia, or action only on request in such cases, appears to me excusable in the context of the particular offense. I would reverse.
NOTES
[1] The record establishes that the deputy property appraiser and the employee who discovered the Parrish infraction were supporters of and contributors to Brand's political campaign.
[2] § 196.061, Fla. Stat. (1987), provides in part:

The rental of an entire dwelling previously claimed to be a homestead for tax purposes shall constitute the abandonment of said dwelling as a homestead, and said abandonment shall continue until such dwelling is physically occupied by the owner thereof; provided, however, that such abandonment of such homestead after January 1 of any year shall not affect the homestead exemption for tax purposes for that particular year; ...
[3] § 196.131(2), Fla. Stat. (1987), provides:

Any person who knowingly gives false information for the purpose of claiming homestead exemption as provided for in this chapter is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or by fine not exceeding $2,500, or both.
[4] We note that Brand and his staff maintained that the Parrish violation was not referred to the Property Appraisal Adjustment Board because it was discovered after the time the Board was authorized to sit. However, no explanation was offered for failure to refer the Viola Edwards denial dated September 27, 1988, for criminal prosecution.