936 So.2d 1164 (2006)
Johnnie C. ROBINSON, Appellant,
v.
STATE of Florida, Appellee.
No. 1D05-3046.
District Court of Appeal of Florida, First District.
August 24, 2006.
*1165 Nancy A. Daniels, Public Defender; and Steven L. Seliger, Assistant Public Defender, Tallahassee, for Appellant.
Charlie Crist, Attorney General; and Trisha Meggs Pate, Assistant Attorney General, Tallahassee, for Appellee.
*1166 BROWNING, J.
Johnnie C. Robinson (Appellant) was charged by information with the manufacture of cocaine (Count One), possession of cocaine with intent to sell or deliver (Count Two), maintaining a place where controlled substances are used (Count Three), and possession of drug paraphernalia (Count Four). At the close of the State's case, defense counsel moved for a judgment of acquittal (JOA) on all counts. The trial court granted a JOA for Counts One and Three, dropped the "intent to sell" element of Count Two, and denied the motion on Count Four. Appellant contends that the trial court erred in sending to the jury the charges of possession of cocaine and possession of drug paraphernalia. Because the State made a prima facie case on the counts that were sent to the jury, the trial court ruled correctly on the motion for JOA. Accordingly, we affirm Appellant's conviction and sentence.
We review de novo the trial court's denial of a motion for JOA, to determine solely whether the evidence is legally sufficient. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002); Jones v. State, 790 So.2d 1194, 1196 (Fla. 1st DCA 2001) (en banc). Given the lack of evidence that Appellant actually possessed the cocaine and the drug paraphernalia, the State had to prove constructive possession to sustain the convictions. See Lester v. State, 891 So.2d 1219, 1220 (Fla. 2d DCA 2005). "Proof based entirely on circumstantial evidence can be sufficient to sustain a conviction in Florida." Orme v. State, 677 So.2d 258, 261 (Fla.1996). When a case is based solely on circumstantial evidence, a special standard of review of the sufficiency of the evidence applies. The evidence must be inconsistent with any reasonable hypothesis of innocence for the conviction to be sustained. See State v. Law, 559 So.2d 187, 188 (Fla.1989); P.M.M. v. State, 884 So.2d 418, 419-20 (Fla. 2d DCA 2004). However, the State is not required to rebut conclusively every possible variation of events that could be inferred from the evidence, but only to introduce competent evidence that is inconsistent with the defendant's theory of events. See Law, 559 So.2d at 189; State v. Allen, 335 So.2d 823, 826 (Fla.1976). Once the State introduces such evidence, it is the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt. See Law, 559 So.2d at 189. The legal test for determining whether a JOA should be granted is "whether after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment." Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981). The Fourth District Court has stated the general rule governing constructive possession:
Proof of guilt based on a constructive possession theory consists of three basic elements:
(1) The accused must have dominion and control over the contraband.
(2) The accused must have knowledge that the contraband is within his presence, and;
(3) The accused must have knowledge of the illicit nature of the contraband.
Wale v. State, 397 So.2d 738, 739 (Fla. 4th DCA 1981); see Jean v. State, 638 So.2d 995, 996 (Fla. 4th DCA 1994); Julian v. State, 545 So.2d 347, 348 (Fla. 1st DCA 1989). "[E]ach of these elements may be proved by circumstantial evidence." Wale, 397 So.2d at 739. The following rule governs cases in which the location of the drugs and paraphernalia is not in the defendant's exclusive possession, but is jointly possessed:

*1167 If the place in which the contraband is found is not in the exclusive possession of the accused, but only in his joint possession, his knowledge of the presence of the contraband on the premises and his ability to maintain control over it will not be inferred, but must be established by extra proof. Such proof may consist either of evidence establishing that the accused had actual knowledge of the presence of the contraband in the place where it is found, or circumstantial evidence from which a jury might properly infer that the accused had knowledge of the presence of the contraband.
Id. at 740; see State v. Giralt, 871 So.2d 983 (Fla. 3d DCA 2004); Julian, 545 So.2d at 348.
Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the State, in accordance with Lynch v. State, 293 So.2d 44, 45 (Fla. 1974), we conclude that the State presented evidence to support every element of possession of cocaine and possession of drug paraphernalia. Accordingly, the trial court correctly denied the motion for JOA as to the counts in question.
According to Investigator Sam Gereg, of the Vice and Narcotics Unit of the Tallahassee Police Department, a search warrant was served at a very small house at 1809 West Pensacola Street on July 2, 2004. No one was at home when the warrant was served. Richard Singletary testified that he owned this rental property; he estimated the size of the home to be 800-900 square feet. The house has two bedrooms (designated northwest and southwest by the authorities for purposes of location and description), a kitchen, and a living room. At the time of the search, Charles Reddick was named on the lease of the home and had been a tenant for about one and one-half years. Appellant's name was not on the lease, and the owner had no rental agreement with him. The owner testified that Appellant was the only roommate about whom he knew, but the owner could not say for certain that Appellant was a roommate. However, the owner frequently saw Appellant coming and going at the house, as many times as two or three times a week over a six- to eight-week period when the owner was working on his next-door rental property. It was not unusual for the owner to allow roommates who were not named on the rental agreement; in fact, he allowed it "all the time." The owner testified that Appellant sometimes had brought the rent payment to him on Mr. Reddick's behalf and had received a receipt made out to Mr. Reddick. The owner testified that after he was asked to change the carpeting in the house, he went inside the home and Appellant helped him with this project. The owner had never seen drugs or drug paraphernalia in the home.
For purposes of resolving the issue on appeal, we focus on the northwest bedroom in the home. Investigator Gereg testified the northwest bedroom had a small dresser, wall shelving, a very small futon-type single bed, and a closet. This bedroom was fully decorated, appeared fully furnished and occupied, and had Coca-Cola souvenirs and other mementos on the shelves. Everything observed by the investigator during the search indicated that only one person, Appellant, resided in that bedroom. A shoebox was filled with photographs that consistently included a gentleman whom the witness identified as Appellant. Various items of paperwork were found on the dresser just inside the bedroom door and on the shelves and by the closet. In that bedroom, every piece of paper that had a name on it had Appellant's first name or his full name, and no other paperwork was found with anyone else's name on it. The paperwork included *1168 an envelope addressed to Appellant, and a second one (postmarked late April 2004) addressed to "Shamaka and Johnny," although both envelopes listed a different address from that of the home searched. Investigator Gereg testified from personal knowledge that the envelope listing Appellant's name alone had an address that had been Appellant's mother's address for seven years. The investigator found Western Union money transfer forms listing Appellant as the "Sender." A deposit form listed "Johnny" as the first name, and a handwritten note with a date of May 2, 2004, was sent to "Johnny." A civil writ of bodily attachment from a court addressed to Appellant (at a different address from the searched home) indicated his child-support arrearage. Three U.S. Postal Service receipts found in the bedroom were dated June 8, 2004, i.e., less than a month before the search warrant was served.
Investigator Gereg testified that the small, waist-high dresser was in the northwest bedroom just inside the door. The top drawer had underwear in it; another drawer had T-shirts. The drawers did not contain dividers to suggest that two people were sharing the space. The small closet had a full wardrobe, and all the shoes and clothes appeared to be of one consistent size. The witness opined that the room appeared to be fully occupied.
Investigator Gereg testified that a plastic bag found in the top drawer of the dresser in the northwest bedroom contained 8.72 grams of crack cocaine. Another 6.54 grams of powdered cocaine was found in the same dresser. The photographic evidence indicates one of these plastic baggies was found wrapped in what appears to be a pair of men's boxer shorts. A 302-gram bag of white, powdery "Come Back Incense" was found in a black shopping bag on a shelf in that bedroom. Numerous small plastic bags were found in the third drawer and on top of the dresser. Having been qualified as an expert in the field of the sale of narcotics and possession of drug paraphernalia, Investigator Gereg opined that white, powdery, and odorless incense of the kind found in the northwest bedroom is frequently sold for use as a cutting agent for cocaine. That is, cocaine is an expensive substance, this type of incense is much cheaper, and the substances are mixed to allow the resulting lower-quality cocaine, of an enhanced volume, to be sold for a much greater profit. The witness opined that this kind of odorless incense, as it was specifically labeled and packaged, has no other use than as a cutting agent for cocaine. "Come back" is a term used when powdered cocaine is cooked into crack cocaine. Investigator Christopher Corbitt, of the Tallahassee Police Department, testified consistently with Investigator Gereg regarding the evidence recovered from the northwest bedroom and the kitchen.
Jeff Fennell, a former Tallahassee Police Department forensic specialist who was admitted as an expert in fingerprint analysis and comparison, testified that among the numerous small plastic baggies found in the dresser, Appellant's fingerprint was found on one of them. His fingerprints appeared also on a baggie that was found in a cooler. Neither of these two baggies contained illegal contraband.
According to Investigator Gereg, the other bedroom, the southwest one, had paperwork and items addressed only to the named lease tenant, Mr. Reddick. That second bedroom had a small dresser. The clothing found in that bedroom indicated the room was occupied by only one person, Mr. Reddick. Plastic baggies were found in the southwest bedroom too, as was a small digital scale of the type *1169 commonly used to measure out sale-size quantities of illegal drugs.
Atop some cabinets in the kitchen was a large glass measuring cup with whitish cocaine residue on the bottom, which Investigator Gereg believed was used to cook crack cocaine. Numerous small plastic baggies were found throughout the kitchen. On a shelf directly behind the stove, the investigators found a beverage can of Mountain Dew soda, the top of which screws off, disclosing a hidden container of the type frequently used to conceal illegal narcotics. A package of incense was found on the kitchen counter.
The State's evidence is sufficient for the jury to have found, beyond a reasonable doubt, that Appellant exclusively and regularly occupied the northwest bedroom within the time period shortly before the home was searched; that Appellant had dominion and control over the contraband found among his personal items in the northwest bedroom; that he knew the contraband was in his presence and was illicit; and that someone else, apparently Mr. Reddick, occupied the other bedroom. See Thames v. State, 366 So.2d 1261 (Fla. 1st DCA 1979).
Challenging the denial of his motion for JOA on Counts Two and Four, Appellant relies on several decisions that are materially distinguishable on their facts. See, e.g., State v. Lopez, 908 So.2d 484 (Fla. 4th DCA 2005) (affirming entry of JOA after jury verdict finding defendant guilty of trafficking in drug MDMA, because evidence that passenger, who was purported owner and supplier of MDMA, had thrown MDMA out of defendant's car was legally insufficient to establish that defendant had dominion and control and was in actual or constructive possession of the drug); State v. Snyder, 635 So.2d 1057 (Fla. 2d DCA 1994) (affirming order dismissing information charging defendant with possession of methamphetamine, where defendant's prior knowledge of methamphetamine delivery to co-defendant and defendant's intent to try some of drug while in car with co-defendant, had police not intervened and interrupted co-defendant before he gave defendant a sample of drug, were insufficient to support charge).
A recitation of the facts in the three remaining decisions cited by Appellant demonstrates why they are materially distinguishable and do not support reversal in the instant case. In Thompson v. State, 375 So.2d 633 (Fla. 4th DCA 1979), police officers executing a search warrant on a residence found Thompson and two other men there and detained them all in the living room while the home was searched. See id. at 634. Three kinds of controlled substances were found hidden in the southeast bedroom, and marijuana was found hidden under the kitchen sink. Thompson, the only one of the men who was prosecuted as a result of this search, was charged with possession of cocaine (found hidden in a bag in a shoe in the bedroom closet), marijuana (found in a toolbox in the bedroom), and barbiturates (found uncovered in a dresser drawer in the bedroom). The State argued that if it proved Thompson had occupied the bedroom where the drugs were found, the evidence would support his conviction for constructive possession of the drugs found in the room. To prove the southeast bedroom was Thompson's, the State relied on circumstantial evidence. After the search, but before Thompson was to be transported to the station for booking, he was given the opportunity to clothe himself and did so by walking into the bedroom in question and putting on clothing from the closet where the cocaine had been found. Electric bills and a pool receipt bearing Thompson's name and the address of the residence being searched were found in *1170 that bedroom. Thompson's car was parked in the garage at the time of the search. An officer had seen Thompson at this residence earlier on the day of the search. After a bench trial, Thompson was found guilty as charged. See id. The Fourth District Court noted that, even assuming that Thompson occupied the southeast bedroom, it found the evidence to be "equivocal" regarding whether another person also occupied that room. The officers were unsure about which articles of clothing Thompson had removed from the closet, and the best case for the prosecution was that Thompson had taken a pair of shoes and a shirt. Although the shoes and shirt apparently fit Thompson, he was small in stature and wore shoes and clothing in sizes usually worn by women. The relevance of these facts is that the testimony indicated the shoes and shirt were of a style and type commonly worn by women and men, and a lease to the residence was found in the southeast bedroom to a lessee named Barbara, which the court noted is typically a woman's name. Proffered testimony of one of the other men who were arrested with Thompson indicated that the shirt Thompson put on belonged to the witness, not to Thompson. Given the evidence that Thompson was not the exclusive occupant of the southeast bedroom, the district court concluded that the trial court had erred in denying the motion for JOA at the end of the State's case. The convictions were reversed and remanded with directions to discharge Thompson. See id. at 637. The panel reasoned that "[t]o accept occupancy, alone, as proof of possession of drugs would mean the potential to possess drugs illegally would be construed to be as much a crime as physically possessing them." Id. at 635. Unlike the equivocal evidence in Thompson, the instant evidence indicated that two different individualsAppellant and Reddickkept their personal belongings separated and exclusively occupied the northwest bedroom and the southwest bedroom, respectively.
In Lester v. State, 891 So.2d 1219 (Fla. 2d DCA 2005), the defendant was driving a car with a woman in the front passenger seat. Lester drove to a location in St. Petersburg that is well-known for drug activity. Neither he nor his passenger knew that a police officer was there watching a man selling narcotics to people in passing cars. The officer saw Lester's car approach and observed an exchange between the passenger and the seller. The seller handed a small object to the passenger, who gave back currency. The officer observed no suspicious activity by Lester. See id. A radioed report from the officer resulted in the stopping of Lester's vehicle within three blocks of the exchange. An officer on the passenger's side of the car saw three small bulges in the seated woman's sock. He testified that his years of experience informed him that the bulges were crack cocaine. After the passenger consented to the officer's request to search her, the officer removed the cocaine. The passenger handed the officer two crack pipes she had concealed in her pants. See id. at 1219-20. With Lester's consent, an officer searched him and his automobile. No drugs or other contraband was found, but the glove compartment contained a new Brillo pad, which Lester admitted having purchased. The officer testified that such pads are often used in crack pipes as a filter and, in fact, both pipes seized from the passenger contained pieces of Brillo. After initially denying any knowledge of his passenger's intent to buy drugs or the involvement of any drugs in the transaction, Lester ultimately admitted that he had smoked crack on the previous day, that his passenger had just received a check and was going to buy crack cocaine, *1171 and that Lester intended to smoke some of it. Lester was charged with possession of cocaine. His motion for a JOA was denied. Given the lack of evidence of Lester's actual possession of the crack cocaine, the Second District Court noted the State had to prove Lester's constructive possession to sustain his conviction for possession. See id. at 1220. Although the evidence established that Lester knew of the presence of the cocaine and its illicit nature, and that he intended to partake in it, no evidence demonstrated his dominion and control over the drug. That is, no evidence showed that Lester had, or could take, actual possession of the crack or that he could compel his passenger to share the cocaine with him. Although Lester intended to use the crack, the police stopped the vehicle before Lester ever acquired possession or control over the drug. Because the State failed to demonstrate Lester's constructive possession of the crack cocaine, the district court reversed and remanded with instructions to discharge him. See id. at 1221. In contrast, the cocaine in the instant case was found in the northwest bedroom, which contained numerous personal belongings connected exclusively to Appellant, not to Mr. Reddick, whose personal belongings were found in the southwest bedroom.
Finally, in P.M.M., 884 So.2d at 418, the high-school resource officer testified that the assistant principal had searched P.M.M.'s backpack and discovered a small plastic bag of marijuana. The baggie was not fingerprinted. The resource officer did not know where the backpack had been before the search. See id. at 419. P.M.M. testified that the assistant principal told her that an anonymous source reported she had something in her backpack that she should not have. P.M.M. agreed to a search of her backpack, thinking that nothing was inside it. See id. P.M.M. denied knowing the marijuana was in her backpack, and she denied it was hers. See id. at 419-20. She testified that on the day of her arrest, and before the search, she had left the backpack unattended on the classroom floor for over an hour during her cooking class, while she worked at a stove 20 to 25 feet away; and unattended on the lunchroom table for 10-15 minutes while she waited in the lunch line. See id. at 419. The State presented no direct evidence that P.M.M. knew of the presence of the contraband. The testimony that others had access to the backpack was unrebutted and unimpeached, and no evidence demonstrated that P.M.M. knew the marijuana was in her backpack (other than the evidence that it was found in her backpack). See id. at 420. Where the circumstantial evidence failed to rebut P.M.M.'s reasonable hypothesis of innocence, the order withholding adjudication and placing her on probation for possession of marijuana was reversed. See id. at 419-20. In contrast, in the case at bar, the drugs and drug paraphernalia were found in Appellant's own bedroom in a private residence.
We AFFIRM Appellant's judgment and sentence.
WOLF and VAN NORTWICK, JJ., concur.