IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

RICHARD SCOTT BATTERSON
A/K/A SCOTT BATTERSON,

        Appellant/Cross-Appellee,

 v.                            Case No.  5D14-3744

STATE OF FLORIDA,

        Appellee/Cross-Appellant.

_____/

Decision filed June 17, 2016

Appeal from the Circuit Court
for Orange County,
Jenifer M. Davis, Judge.

Amy S. Tingley, Robert J. Stovash,
Matthew J. Pearce and Kirsten D. Blum,
Stovash, Case & Tingley, P.A., Orlando;
Michael J. Snure and William R. Ponall, of
Snure & Ponall, P.A., Winter Park; and
Fritz Scheller, of Fritz Scheller, P.L.,
Orlando, for Appellant/Cross-Appellee.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Kellie A. Nielan,
Assistant Attorney General, Daytona
Beach, for Appellee/Cross-Appellant.

PER CURIAM.

     AFFIRMED.


SAWAYA and BERGER, JJ., concur.
ORFINGER, J., dissents, with opinion.

ORFINGER, J., dissenting.                                    Case No. 5D14-3744

Richard Scott Batterson appeals his conviction of bribery in violation of section 838.015(1), Florida Statutes (2013). Because I believe the State failed to prove that Batterson solicited or accepted a benefit, an essential element of the offense, I would reverse his conviction. Thus, I respectfully dissent.

Florida law makes bribery a criminal offense. Specifically, section 838.015(1) makes it a crime for a public servant to corruptly request, solicit, accept, or agree to accept for himself or another, any pecuniary or other benefit not authorized by law with an intent or purpose to influence the performance of the public official's public duties.[1] Section 838.014(1), Florida Statutes (2013), defines "benefit" to mean a "gain or advantage, or anything regarded by the person to be benefited as a gain or advantage, including the doing of an act beneficial to any person in whose welfare he or she is interested, including any commission, gift, gratuity, property, commercial interest, or any other thing of economic value not authorized by law."

Batterson argues that the trial court erred in denying his motion for judgment of acquittal. In reviewing a motion for judgment of acquittal, a de novo standard of review applies. Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002). Generally, an appellate court

---

[1] More precisely, section 838.015(1), Florida Statutes (2013), provides:

> (1) "Bribery" means corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept for himself or herself or another, any pecuniary or other benefit not authorized by law with an intent or purpose to influence the performance of any act or omission which the person believes to be, or the public servant represents as being, within the official discretion of a public servant, in violation of a public duty, or in performance of a public duty.

2

will not reverse a conviction that is supported by competent, substantial evidence. Id. In moving for a judgment of acquittal, a defendant admits the facts stated in the evidence adduced, and every conclusion favorable to the adverse party that can be reasonably drawn from the evidence. Reynolds v. State, 934 So. 2d 1128, 1145 (Fla. 2006). There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact can find the existence of the elements of the crime beyond a reasonable doubt. Pagan, 830 So. 2d at 803. An appellate court's review is limited to whether the evidence the State presented in its case in chief was legally sufficient. Robinson v. State, 936 So. 2d 1164, 1166 (Fla. 1st DCA 2006).

Because we view the evidence in the light most favorable to the State, the facts are quoted directly from the State's answer brief:

> Carolyn Johnson, a lobbyist who formerly lived in Orlando, was in Orlando for work on July 18, 2013, and called Batterson, Chris Dorworth, and several other people to get together for happy hour at CaddyShanks. Once there, she talked with Batterson about him being on the [Orlando-Orange County] Expressway Authority Board, and him possibly becoming vice chairman. Batterson was "bragging" about it.

> Mark Callahan has worked as an engineer in central Florida since 1986, and the companies that he has worked for have had contracts with the Expressway Authority. He is a project manager, and also serves as a client/service manager; it is his responsibility to get to know the clients, understand what they are looking for and the type of projects they have coming up. His current employer, CH2M Hill, had a contracts [sic] with the Expressway Authority, one of which was the Wekiva Parkway contract. He understands the procedure for obtaining contracts with the Expressway Authority. The Authority staff handles most of the procurement process, then the staff recommends to the board, and the board votes and approves.

> Callahan has contacts with the board members for a number of reasons. He introduced himself to Batterson after

3

Batterson was appointed as a board member to the Expressway Authority, and indicated a willingness to meet with Batterson to discuss any questions he may have had related to the Wekiva Parkway project. Callahan had gotten in touch with Batterson maybe four or five times after Batterson was appointed to the Authority board.

On July 18, 2013, Callahan sent Batterson an email about "catching up," and Batterson invited him to "swing by" CaddyShanks that night. Callahan wanted to discuss a new member that had been appointed to the board, Marco Pena. Batterson was at CaddyShanks when Callahan arrived, as was Chris Dorworth. Callahan sat next to Batterson.

Batterson asked Callahan if his company would be interested in having the general consulting contract (GEC) for the Expressway Authority. The GEC is a large and prestigious contract that is coveted in their industry. It was the type of contract that Callahan's firm would be very interested in. Callahan told Batterson that a firm called Atkins already had the contract, and asked how he would make a change. Batterson indicated that he was extremely confident that he would become chairman of the Expressway Authority. Batterson was bold and confident, almost puffed up about becoming chairman. Batterson:

> [c]ontinued on, said that I'll be chairman. He indicated that Marco Pena was appointed by the Governor and that was a person he had recommended to the Governor's office to be appointed and that Marco was his boy, was the terminology I recalled he used, and he went on further and indicated that Mr. Dorworth, who was sitting across the table, was very close to Ananth Persaud, and Ananth Persaud is the Secretary of the Florida D.O.T. and that Mr. Dorworth also was dating, at least, at that time, a young lady named Rebecca Hammond who worked for Florida Department of Transportation and worked directly with Mr. Persaud, as well, and as well [sic] Noranne Downs, who was the Assistant Secretary for Florida D.O.T. and was a board member of the Orlando Expressway Authority.

4

Callahan explained the relationships between all of the people he had mentioned. Dorworth was dating Hammond, who worked for DOT, and Noranne Downs was a board member of the Expressway Authority. It takes three board votes to approve a contract.

At that point it was Callahan's belief that Batterson could control the board. Callahan believed that Batterson would vote, that Marco Pena was his voter, and that through Chris Dorworth, they could somehow align Noranne Downs's vote. At first he was thinking how could this happen, but it became increasingly clear to him that it could. In his thirty years as an engineer, Callahan has never had a board member come up to him and offer him a contract.

As the conversation continued and it became clear to Callahan that Batterson seemed to have the ability to collect votes at the board level, Batterson indicated that he had some firms he would like Callahan to "put on the team" if they were to go after the general contract. It became concerning to Callahan because he had never really had a public servant ask him to put specific people on teams. It is not generally how they operate, and he indicated to Batterson that they would have to review each firm and make sure they were qualified. Generally, Callahan's firm has firms they have worked with in the past, and staff level at the client (Expressway Authority) will also indicate which firms are doing a good job, and they assemble team members from that. But no staff or board members had ever told him who to put on the team.

(Citations omitted). The State subsequently filed an information, alleging that Batterson "corruptly request[ed] or solicit[ed] MARK CALLAHAN, for himself or another, any pecuniary or other benefit not authorized by law; to wit: the hiring of, subcontracting with or participation by individuals, firms or other entities suggest[ed] by RICHARD SCOTT BATTERSON a/k/a SCOTT BATTERSON in a consulting contract . . . ."

At the trial, the court instructed the jury that to prove the crime of bribery, the State was required to prove four elements beyond a reasonable doubt:

(1)    RICHARD SCOTT BATTERSON was a Public Servant.

5

(2)     RICHARD SCOTT BATTERSON requested or solicited from MARK CALLAHAN the hiring or inclusion of individuals, firms, or other entities of RICHARD SCOTT BATTERSON's choosing as employees or subcontractors or participants in a consulting contract or other arrangement approved or awarded by Orlando- Orange County Expressway Authority to CH2M Hill[.]

(3)     The the [sic] hiring or inclusion of individuals, firms, or other entities of RICHARD SCOTT BATTERSON's choosing was something of value, benefit, or advantage to RICHARD SCOTT BATTERSON or person in whose welfare RICHARD SCOTT BATTERSON was interested, which was not authorized by law.

(4)     The request or solicitation was made with the intent of corruptly being influenced in the performance of some act that

MARK CALLAHAN believed to be:

    a. within the official discretion of RICHARD SCOTT BATTERSON, or

    b. in violation of a public duty of RICHARD SCOTT BATTERSON, or

    c. in performance of public duty of RICHARD SCOTT BATTERSON

OR

RICHARD SCOTT BATTERSON represented as being

    a. within his official discretion, or

    b. in violation of his public duty, or

    c. in performance of his public duty.

The evidence, viewed in the light most favorable to the State, supports the jury's conclusion that Batterson was a public servant and solicited Callahan to include certain unidentified firms in a consulting contract to be awarded by the Expressway Authority. However, the evidence is woefully lacking that Batterson, or someone in whose welfare he was interested, stood to gain some benefit or advantage from such an arrangement.

6

The State argues that whether "Batterson obtained a benefit is an issue of intent and therefore should be left to the fact-finder to resolve." I disagree, because such an analysis improperly conflates the intent element of the crime with the benefit element. Benefit and corrupt intent are two separate and distinct elements of the crime, and the State must prove each beyond a reasonable doubt. The existence of a benefit is not an issue of intent, although I agree that if there was evidence that Batterson stood to benefit from such an arrangement, the determination of corrupt intent is a question for the jury. See State v. Flansbaum-Talabisco, 121 So. 3d 568, 571 (Fla. 4th DCA 2013).

The State argues that when Batterson told Callahan that he had some firms that he would like Callahan to "put on the team," the "only inference that can be drawn from this evidence was that Batterson intended to receive a benefit." To me, that is a leap too far. We might speculate that one of the unnamed firms that Batterson wanted to "put on the team" was providing some benefit to him. However, we could also speculate that Batterson was merely interested in seeing that disadvantaged businesses or local contractors be given a fair shot at the subcontracts that would, of necessity, be entered into by Callahan's firm. But speculation is not proof and criminal convictions must not be based on speculation. Straughter v. State, 384 So. 2d 218, 219 (Fla. 3d DCA 1980). I would reverse Batterson's conviction.