609 So.2d 608 (1992)
Donald V. BAUER, Appellant,
v.
STATE of Florida, Appellee.
No. 91-1002.
District Court of Appeal of Florida, Fourth District.
May 13, 1992.
On Motion for Rehearing September 23, 1992.
*609 F. Lee Bailey and David M. Schultz of Law Offices of F. Lee Bailey, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Melynda L. Melear, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Appellant claims that his conviction for official misconduct should be overturned because the state failed to prove a violation of section 839.25(1), Florida Statutes (1989). We disagree and affirm.
This case involved a financial transaction called a reverse repurchase agreement. In this type of transaction, an investor purchases a security, which in turn is used as collateral for a loan to buy that security. Thus, it involves a simultaneous purchase and loan. If the value of the security increases, then money is made on the difference between the loan and the increased value of the security, but when the value of the security drops the collateral is worth less. More money is then required to support the loan through a margin call. These types of transactions are handled by "secondary" brokers for investors. The advantage of these transactions is a very attractive rate of return. However, the investment is very speculative.
After working for about ten years for the First National Bank of Palm Beach, appellant started working as the cash management coordinator of the City of West Palm Beach. In his job, he managed the City's cash investment portfolio worth over $70,000,000. When he was in training for his position with the City, appellant discussed reverse repurchase agreements with one of his superiors who told him that they were not a good idea. Furthermore, appellant was not authorized on behalf of the City to borrow money nor to invest through secondary brokers.
Despite the warnings, in 1987 appellant Bauer arranged with a secondary broker to buy into a reverse repurchase with the City's funds. It appears from the record that the first purchase was a telephone transaction with the broker, authorizing the purchase of the security. Bauer recorded absolutely nothing on the books regarding this transaction. Unfortunately, when the stock market crashed later that year, the secondary broker made numerous margin calls, demanding security to back up the transaction. Bauer made twelve payments from the City account which he controlled totalling about $600,000 between January and May 1987. Rather than properly recording these as losses in the accounting journal entries, he improperly recorded these in an asset account entitled "investment-repurchase." He made twelve such journal entries. To avoid future margin calls, appellant then authorized the bank to wire a $1,000,000 treasury bond owned by the City. Appellant claims that he thought this was to serve only as collateral; however, the broker sold the bond for approximately $816,000 and returned to the City its other $600,000 payments made on previous margin calls. At that point, appellant made a thirteenth journal entry, describing it as a redemption of repurchase, which in essence zeroed out the asset account built up by the prior twelve entries. Between May and June there were additional losses. On June 29, 1987, the broker returned to the City the remainder of the proceeds from the sale of the treasury bond which amounted to only $24,000. Thus the City lost nearly $1,000,000 on appellant's dealings.
After appellant's activities were discovered during an external audit, he was arrested for thirteen counts of official misconduct arising from the thirteen journal entries. At trial, the state's position was that appellant deliberately made the improper journal entries to cover up his prohibited activities and thereby retain his job. Appellant defended on the theory that any journal entries were simply the result of honest mistakes. Appellant's sole issue on appeal is that the trial court erred in denying his motion for judgment of acquittal.
The statute under which appellant was charged reads:
(1) "Official misconduct" means the commission of the following acts by a public servant, with corrupt intent to obtain a *610 benefit for himself or another or to cause unlawful harm to another:
.....
(b) knowingly falsifying ... any official record or official document.
(2) "Corrupt" means done with knowledge that act is wrongful and with improper motives.
§ 839.25(1), Fla. Stat. (1989). In Linehan v. State, 442 So.2d 244 (Fla. 2d DCA 1983), modified on other grounds, 476 So.2d 1262 (Fla. 1985), Judge Lehan distinguished between general intent crimes and specific intent crimes. He stated:
A "general intent" statute is one that prohibits either a specific voluntary act or something that is substantially certain to result from the act (e.g., damage to a building is the natural result of the act of setting a building afire). A person's subjective intent to cause the particular result is irrelevant to general intent crimes because the law ascribes to him a presumption that he intended such a result.... Thus, in general intent statutes words such as "willfully" or "intentionally," without more, indicate only that the person must have intended to do the act and serve to distinguish that conduct from accidental (noncriminal) behavior or strict liability crimes... .
.....
Specific intent statutes, on the other hand, prohibit an act when accompanied by some intent other than the intent to do the act itself or the intent (or presumed intent) to cause the natural and necessary consequences of the act... . Accordingly, a crime encompassing a requirement of a subjective intent to accomplish a statutorily prohibited result may be a specific intent crime... . Thus, to be a "specific intent" crime, a criminal statute which contains words of mental condition like "willfully" or "intentionally" should include language encompassing a subjective intent, for example, intent to cause a result in addition to that which is substantially certain to result from a statutorily prohibited act.
Id. 442 So.2d at 247-48. As it applies to the statute here in question, the statute contains a general intent of knowing the act is unlawful but also requires a specific intent that it be done with the intent to cause a benefit to himself or harm to another. Thus, the focus of our inquiry is whether or not the various elements of intent were proved.
The trial judge in this case heard voluminous evidence regarding these transactions. There was ample evidence that appellant was told not to invest in reverse repurchase options and not to deal with secondary brokers. Further, it was clear that by statute only the city commission could authorize a loan transaction. While appellant claims that the journal entries were merely honest mistakes, the net effect of the entries was to show an ever increasing asset account when in fact the exact opposite was occurring. The account was then zeroed out by the last journal entry which would have suggested a breakeven situation, rather than the substantial loss that really occurred. While accounting for reverse-repurchase agreements is complicated, an accounting expert testified that the journal entries were incorrect and misleading. Furthermore, when the discrepancies were discovered, appellant was requested to produce backup documentation for the journal entries, which he never did. The trial court found that the acts were done with knowledge that they were wrongful and unlawful. He further found that, contrary to these being innocent mistakes by a poorly trained bookkeeper, "considerable skill was employed to mask or cover the unlawful conduct. This is proved here and enhances the culpability of the defendant." In fact what the court found was that the acts were knowingly done and that "he had to know the serious financial injury he worked." In other words, the defendant intentionally performed the prohibited act whose natural consequences (the losses) may reasonably be expected to follow. Thus, the state presented adequate evidence as to general intent.
With regard to specific intent, it was the state's burden to prove that the appellant acted with the intent to benefit himself or another or with the intent to *611 cause harm to another. While the trial court found that the acts of defendant caused affirmative harm to the City, harm in fact is not the test for a finding of specific intent. The commission of the act itself does not give rise to a specific intent to commit the act. Furthermore, there is simply no evidence in the record here revealing that the appellant intended to harm the City. Thus, the state failed to prove the specific intent to cause harm.
However, the state can still satisfy its burden if it proved Bauer's specific intent to benefit himself. There was no direct evidence of this here. Cf. Barr v. State, 507 So.2d 175 (Fla. 3d DCA 1987) (conviction for official misconduct upheld where direct evidence was presented that police officer falsified official reports in an attempt to avoid reprimand for failure to follow police procedures). However, the state can also prove specific intent by circumstantial evidence. Rebjebian v. State, 44 So.2d 81, 82-83 (Fla. 1949); Smith v. State, 87 Fla. 502, 100 So. 738 (Fla. 1924). Where the state attempts to prove its case by circumstantial evidence, the state can survive a motion for judgment of acquittal simply by presenting "competent evidence from which the jury could infer guilt to the exclusion of all other inferences." See State v. Law, 559 So.2d 187 (Fla. 1989). As applied here, the state only needed to present competent evidence from which the fact-finder could infer this specific intent to the exclusion of the appellant's "honest mistake" theory. The state satisfied its burden here. For a period exceeding one year, the appellant never told anyone about the reverse repurchase or that the City's million dollar bond had been sold. When the appellant's supervisor confronted him with an approximate million dollar loss and asked him for backup documentation, appellant repeatedly responded that he was going to get it from the broker. However, he never did this, and when his supervisor called the broker, she found out that the broker had gone out of business. Then, when confronted by the city attorney and city manager with the million dollar loss, he told them that he knew the money was gone but that he had not taken it and knew that they would find it. It was only at the point when he was told that there was going to be an official investigation that he resigned. From the above, the fact-finder could have logically inferred that appellant's conduct in concealing the losses which were accruing in the reverse repurchase transaction was intended to avoid punishment, whether it be in the form of a reprimand, lawsuit, criminal charges, termination or the like. Avoidance of punishment is a benefit for purposes of official misconduct. See Barr, 507 So.2d at 177. Furthermore, this evidence which suggests a deliberate and prolonged cover-up would be inconsistent with simply an honest mistake. Thus, we conclude that the state presented sufficient circumstantial evidence of appellant's specific intent to benefit himself to survive the motion for judgment of acquittal.
We note a possible conflict between our finding on the evidence of a benefit and the trial court's finding that the state "makes no claim that the defendant benefitted from these transactions." While the state did comment in closing that the issue in this case was harm to the city rather than benefit to the defendant, a look beyond these labels reveals that the state really did argue benefit. In its closing argument, the state raised Barr, which only addressed the issue of benefit, and argued that the defendant had acted because he "couldn't afford to lose his job." By doing so, we conclude that the State did raise the benefit issue, albeit somewhat unartfully. We therefore reject the trial court's finding to the contrary as unsupported by the record. See Beaty v. Miller, 480 So.2d 196 (Fla. 1st DCA 1985). Finally, although we disagree with the trial court's reasoning, we affirm the trial court's order as "right for the wrong reason." See Owens v. State, 354 So.2d 118 (Fla. 3d DCA 1978).
GLICKSTEIN, C.J., and LETTS and WARNER, JJ., concur.

ON MOTION FOR REHEARING
PER CURIAM.
We deny the appellant's motion for rehearing.
*612 GLICKSTEIN, C.J., and LETTS, J., concur.
WARNER, J., dissents with opinion.
WARNER, Judge, dissenting.
The appellant has moved for rehearing claiming that our original opinion violates the double jeopardy clause of the Constitution by finding sufficient evidence of benefit to appellant to sustain his conviction where the trial court found none. While the claim may raise double jeopardy questions, the bottom line amounts to a contention that we impermissibly reweighed the facts and decided a fact contrary to the finding of the trial court. Having spent considerable time reviewing the record, I am compelled to agree. Therefore, I would now reverse.
Our original opinion attempts to reconcile our conclusion that the evidence would support a finding of benefit with the trial court's finding that the state "makes no claim that the defendant benefitted from these transactions." We maintained that the trial court overlooked the claim of benefit made by the state and thus did not decide the issue. Upon further review of the record, I conclude that our interpretation is wrong. Not only did the state argue benefit but the record reveals that the issue of benefit was thoroughly briefed. Appellant submitted proposed findings of fact which included a finding that the state had attempted to prove a "benefit" (which was also referred to as improper motive), either (1) to obtain stimulation from engaging in speculative activity or (2) to cover up and hide activity to keep his job. The proposed findings refuted both of these claims.
To counter appellant's presentation, the state submitted findings that appellant benefitted from preparing misleading journal entries by covering up his wrongdoing to keep his job; fed defendant's passion for the excitement generated by these speculative investments; kept a $200,000 account outside control of the city; and generated substantial fees to brokers who dealt exclusively with him. The appellant and state each filed objections to the other's proposed findings.
The trial court's order used neither set of findings, but instead the court prepared its own judgment. (The trial court mentioned all of the memorandums filed in the Final Judgment.) Our original opinion interpreted the court's opinion as overlooking the claims the state made. Given my subsequent review of what the trial court had before it, I can hardly say that the trial court was unaware of the claims of benefit to defendant that the state made.
Thus, it appears to me that we erroneously interpreted the trial judge's order in our initial opinion. I now conclude that the trial court found that the defendant did not benefit from these transactions. Given that finding of fact, which is supported by the record (all of the state's evidence of benefit being entirely circumstantial), an essential element of the charge was not proved. The trial court should have granted the motion for judgment of acquittal.
I would reverse the conviction and sentence of appellant and remand for the entry of a judgment of acquittal.