RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

              *v.*                                            No. 11-4130

STEVEN J. TERRY,
              *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cr-390-1—Sara E. Lioi, District Judge.

Argued: October 10, 2012

Decided and Filed: February 14, 2013

Before: SUTTON, GRIFFIN and WHITE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Sylvester Summers, Jr., SYLVESTER SUMMERS, JR., CO., LPA,
Cleveland, Ohio, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S
OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Sylvester Summers, Jr.,
SYLVESTER SUMMERS, JR., CO., LPA, Cleveland, Ohio, for Appellant. Daniel R.
Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge. "If you can't eat [lobbyists'] food, drink their
booze, . . . take their money and then vote against them, you've got no business being
[in politics]," said Jesse Unruh, a one-time Speaker of the California General Assembly,
in the 1960s. Bill Boyarsky, *Big Daddy: Jesse Unruh and the Art of Power Politics* 112
(2007). That is one way of looking at it. Another way of looking at it comes courtesy
of the federal anti-corruption statutes, one of which prohibits an official from accepting

1

things of value "in return for" official acts. 18 U.S.C. § 201(b)(2). A jury found that a state court judge did just that and convicted him of several honest services fraud violations. We affirm.

I.

In April 2007, Governor Ted Strickland appointed Steven Terry to fill a vacancy on the Cuyahoga County Court of Common Pleas. Soon after, Terry announced that he intended to seek reelection to retain the seat the following November. Having never run for elected office before, Terry sought the help of County Auditor Frank Russo, a presence in Cleveland politics. Russo agreed to help Terry with his reelection campaign and indeed had already helped him by recommending Terry to the Governor for the appointment and by lobbying members of the local judicial nominating committee to support him.

Terry knew that Russo was helping him behind the scenes. What Terry did not know was that the FBI was investigating Russo on corruption charges and that federal agents had tapped Russo's phones. On July 15, 2008, Russo had a phone conversation with a local attorney, Joe O'Malley, about two foreclosure cases on Terry's docket. O'Malley represented several homeowners in a lawsuit against American Home Bank, and he asked Russo to convince Terry to deny the bank's motions for summary judgment. Russo promised to call Terry and make sure Terry did what he was "supposed to do" with the cases. Gov't Ex. 116; 2 Trial Tr. 294.

Two days later, Russo and Terry spoke on the phone. Russo told Terry to deny the motions for summary judgment, and Terry said he would. In the same conversation, the two men also discussed Russo's attendance at future fundraisers for Terry's reelection campaign.

That same day, Terry contacted the magistrate judge responsible for the foreclosure cases and told her to deny the motions for summary judgment. Surprised by Terry's directive, the magistrate passed along the docket so that Terry could deny the motions himself. Terry did just that, even though he never reviewed the case files, never

read the motions before denying them and never obtained a recommendation from the magistrate or anyone else (within the court system) about how to rule on the motions.

Terry's collaboration came relatively cheap. Russo's political action committee donated $500 to Terry's reelection campaign in July 2007. Russo's committee purchased around $700 worth of stationery, envelopes and car magnets for Terry's campaign in July 2007. And Russo had his official staff work for Terry's campaign during business hours and provided other political help throughout the relevant time period. In exchange for this assistance, Russo explained that he expected Terry "to answer the phone any time I called. And any time I called with a recommendation, or a problem, or a case, I would expect Steve to give it special attention" and "follow through for me." 2 Trial Tr. 290. Russo in other words expected that his political and financial patronage meant Terry "would do what I asked him to do," including "granting [] a motion so it wouldn't tie [a] case up." *Id*. For his part in this and like-minded arrangements with other Cleveland-area officials, Russo pled guilty to twenty-one political corruption counts of one form or another and received a 262-month prison sentence.

For his part, Terry ran into similar problems. A grand jury indicted him on five political corruption charges. Count One alleged that Terry conspired with Russo to commit mail fraud and honest services fraud. Count Two alleged that Terry committed mail fraud by denying the bank's summary judgment motions. And Counts Three, Four and Five alleged that he committed honest services fraud by "accepting gifts, payments, and other things of value from Russo and others in exchange for favorable official action." R. 24 ¶ 52. Each honest services fraud count was tied to a mailed document: Counts Three and Four stemmed from checks Russo's political action committee wrote to pay for Terry's stationery, envelopes and car magnets, while Count Five stemmed from a thank you note Terry wrote to Russo. *Id*. ¶ 54.

After a five-day trial, a jury convicted Terry on Counts One, Three and Four, and acquitted him on Counts Two and Five. The district court sentenced him to 63 months in prison on each count, to be served concurrently.

II.

Terry presses three arguments on appeal:   (1) the district court should have dismissed the indictment because it failed to identify a crime under *United States v. Skilling*, 130 S. Ct. 2896 (2010); (2) the district court improperly instructed the jury on the requirements for showing that Terry accepted a bribe; and (3) insufficient evidence showed that Terry accepted a bribe.

A.

The district court correctly denied Terry's motion to dismiss.  An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged" and a "citation of the statute . . . that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c).  Terry's indictment did just that.  It outlined the contours of the relationship between Terry and Russo, detailed how Russo instructed Terry to deny the bank's motions for summary judgment, listed the benefits Terry received from Russo and mentioned each statute Terry allegedly violated.

The indictment also complied with *Skilling*.  Honest services mail fraud requires the government to prove that the defendant used the mail to carry out a "scheme or artifice to defraud" another, 18 U.S.C. § 1341, of "the intangible right of honest services," *id.* § 1346.  That intangible right, *Skilling* made clear, covers only schemes in which the defendant deprives another of his honest services by participating in a bribery or kickback scheme.  130 S. Ct. at 2931.  The relevant counts of Terry's indictment allege that he "devised and intended to devise a scheme and artifice to defraud" the citizens of Cuyahoga County (including the litigants before him) of honest services "through bribery and kickbacks" that he "knowingly caused to be delivered by mail." R. 24 ¶ 51.  Several details supported the allegations, including the checks from Russo's political action committee that traveled through the mail and the summary-judgment motions that Terry denied at Russo's behest.

Terry argues that, in upholding the indictment, the district court misread *Skilling* to say that honest services fraud required the government to prove that he *also* violated

a state-law duty.  But why should Terry care?  Right or wrong, the district court's decision benefitted Terry.  By requiring the government to show Terry violated a state-law duty, the district court *added* an element to the government's case.  That helped Terry; it could not conceivably prejudice him.  In narrowing honest services fraud to require a bribe or kickback, *Skilling* did nothing to prevent federal courts from narrowing the offense still further to include only bribes or kickbacks that also violate a state-law duty.  *See* 130 S. Ct. at 2928 n.36 (noting without elaboration that "[c]ourts have disagreed about whether § 1346 prosecutions must be based on a violation of state law").  We thus need not wade into the debate over whether a state-law violation is a precondition of honest services fraud.  *Compare United States v. Brumley*, 116 F.3d 728, 734–735 (5th Cir. 1997), *with United States v. Weyhrauch*, 548 F.3d 1237, 1245–46 (9th Cir. 2008).

B.

Terry's second claim turns on the proper definition of a bribe when it comes to a public official.  The slate is not clean.  Bribery in this setting has long been taken seriously.  *See, e.g.*, Herodotus, *The Histories* 5:25 (A.D. Godley trans., Harvard Univ. Press 1920) (describing how, in ancient Persia, a judge who accepted a bribe was flayed alive and his successor was forced to sit on a chair made from the predecessor's skin).  Punishment for the offense today is less severe, but the prohibition remains.  The political-corruption statutes and cases make a few principles in this area clear:

- A public official can commit honest services fraud only by accepting a bribe or a kickback.  *Skilling*, 130 S. Ct. at 2931.

- A public official accepts a bribe when he "corruptly . . . receives . . . anything of value . . . in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2); *see also* 18 U.S.C. § 666(a)(1)(B) (similar definition in federal-programs bribery statute); Ohio Rev. Code § 2921.02(b) (similar definition in state bribery statute).

- One element of bribery is that the public official must agree that "his official conduct will be controlled by the terms of the promise or the undertaking." *McCormick v. United States*, 500 U.S. 257, 273 (1991); *see also United States v. Brewster*, 408 U.S. 501, 526 (1972) ("The illegal conduct is taking or agreeing to take money for a promise to act in a certain way."); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) (looking to extortion cases to interpret a bribery statute because the two crimes are "different sides of the same coin").

- This agreement must include a quid pro quo—the receipt of something of value "in exchange for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999).

- The agreement between the public official and the person offering the bribe need not spell out which payments control which particular official acts. Rather, "it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose." *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009); *accord United States v. Jefferson*, 674 F.3d 332, 358–59 (4th Cir. 2012); *Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012); *United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007).

That is a start. These principles, to be sure, do not spell out what kinds of agreements—and what level of specificity—must exist between the person offering a bribe and the public official receiving it. And some cases debate how "specific," "express" or "explicit" a quid pro quo must be to violate the bribery, extortion and kickback laws. *See, e.g.*, *United States v. Ring*, ___ F.3d ___, No. 11-3100, 2013 WL 276020, at \*4 (D.C. Cir. 2013) ("[C]ourts have struggled to pin down the definition of an explicit quid pro quo in various contexts."); *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011); *United States v. Bahel*, 662 F.3d 610, 635 n.6 (2d Cir. 2011); *United States v. Whitfield*, 590 F.3d 325, 348–54 (5th Cir. 2009).

Yet these adjectives do not add a new element to these criminal statutes but signal that the statutory requirement must be met—that the payments were made in connection with an agreement, which is to say "in return for" official actions under it. So long as a public official agrees that payments will influence an official act, that suffices. What is needed is an agreement, full stop, which can be formal or informal, written or oral. As most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess. "[M]otives and consequences, not formalities," are the keys for determining whether a public official entered an agreement to accept a bribe, and the trier of fact is "quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor." *United States v. Evans*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment); *see also McCormick*, 500 U.S. at 270 ("It goes without saying that matters of intent are for the jury to consider."); *Ring*, 2013 WL 276020, at *7 (noting that intent "distinguishes criminal corruption from commonplace political and business activities"); *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012) ("We rely on the good sense of jurors . . . to distinguish intent from knowledge or recklessness where the direct evidence [of a quid pro quo] is necessarily scanty.").

That a bribe doubles as a campaign contribution does not by itself insulate it from scrutiny. No doubt, a contribution is more likely to be a duty-free gift than a bribe because a contribution has a legitimate alternative explanation: The donor supports the candidate's election for all manner of possible reasons. *See Buckley v. Valeo*, 424 U.S. 1, 21 (1976). But the prosecution may rebut that alternative explanation, and context may show that an otherwise legitimate contribution is a bribe. Take *Evans*. In that case, the Court permitted a jury to convict a state legislator who attempted to claim the payment he received was a campaign contribution. *See* 504 U.S. at 257–59. Take as well the Fifth Circuit's decision in *Whitfield*. Two state judges argued that the loan guarantees they received were made in the context of their electoral campaigns and thus required special protection, but the court upheld a finding that the payments were bribes.

590 F.3d at 353.  If an official receives money "through promises to improperly employ his public influence," he has accepted a bribe.  *Abbey*, 560 F.3d at 519.  A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions.  No bribe thus occurs if the elected official later does something that benefits the donor.  On the other hand, if a donor (like Russo) makes a contribution so that an elected official will "do what I asked him to do," 2 Trial Tr. 290, and the official (like Terry) accepts the payment with the same understanding, the donor and the official have formed a corrupt bargain.  That agreement marks the difference between a run-of-the-mine contribution and a bribe.

Hold on, says Terry:  Bribery should have two definitions, not one, a definition for public officials who may not receive campaign contributions and a definition for those who may.  For public officials who may not receive campaign contributions—appointed officials, for instance—any payment in exchange for a future benefit is a bribe, he says.  Terry Letter Br. at 3.  But for officials who may accept campaign contributions, a payment becomes a bribe only if it is made "in exchange for a *specific* official act or omission."  *Id.* (emphasis added).  Congress, however, did not distinguish between public officials who may legally accept contributions and those who may not in the bribery statutes.  Nor has the Supreme Court.  It has refused to "distinguish[] between legal and illegal campaign contributions" in the context of extortion. *McCormick*, 500 U.S. at 271; *see also United States v. Brewster*, 506 F.2d 62, 77 (D.C. Cir. 1974) (refusing to carve out an exception in the federal bribery statute for campaign contributions).  An agreement, once again, is the dividing line between permissible and impermissible payments.

Terry persists that campaign contributions must meet a higher standard to become a bribe because "the financing of political campaigns depends upon officials accepting contributions from people expecting some kind of benefit in return."  Terry Reply Br. at 20.  That sentiment may sum up Frank Russo's donation strategy, but a contribution also may represent nothing more than "a general expression of support for the candidate and his views."  *Buckley*, 424 U.S. at 21.  Just as "[n]ot every campaign

contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal," *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009), not every contribution to an elected judge is a bribe. Whatever else *McCormick* may mean, it does not give an elected judge the First Amendment right to sell a case so long as the buyer has not picked out *which* case at the time of sale.

The jury instructions in this case accurately conveyed that an agreement is the key component of a bribe. The district court told the jury that, in order to find that Terry violated the honest services fraud statute, it needed to find a "quid pro quo": that is, Terry agreed "to accept [a] thing of value in exchange for official action." 5 Trial Tr. 1189. A "thing of value" could include a campaign contribution, so long as that was "received in exchange for official acts." *Id.* at 1192. Terry's intent to exchange official acts for contributions could be "based on [Terry's] words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them." *Id.* Each payment did not need to be tied to a specific official act, so long as Terry understood that, "whenever the opportunity present[ed] itself," Terry would "take specific official actions on the giver's behalf." *Id.* at 1190. These instructions matched the definition of bribery. The jury needed to find that Terry agreed to accept things of value in exchange for official acts.

## C.

Based on these instructions, the jury found that Terry accepted a bribe. We may overturn that conclusion only if, after "viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

A jury could find that Terry and Russo entered an agreement to fix cases. Start with the benefits, financial and otherwise, that Russo provided to Terry during the relevant time period. He gave Terry's campaign $500. He supplied Terry's campaign with approximately $700 in campaign materials. He expected his employees in the Auditor's office to engage in electioneering for Terry during office hours. And he hired

a woman Terry had fired from his chambers staff to prevent Terry from suffering negative publicity.

A flow of benefits from one person to a public official, to be sure, does not by itself establish bribery. The benefits instead must be part and parcel of an agreement by the beneficiary to perform public acts for the patron. That existed as well. On one side of the bargain, Russo thought that they had a deal. In return for showering Terry with benefits, Russo expected Terry to use his official powers whenever and however Russo requested. Any time Russo called, he expected Terry to "give it special attention" and "follow through with me." 2 Trial Tr. 290. "Special attention," he clarified, meant that "whether it would be a character reference or whether it would be a case," Terry would "do what I asked him to do." *Id*.

So, too, on the other side of the bargain. Although Terry disclaimed at trial any agreement to fix cases in which Russo had a stake, his actions belied his words. Terry's rulings on the foreclosure cases were, at the very least, highly irregular, and the reality that a tape recording captured the Russo-Terry conversation immediately preceding these rulings did Terry no favor. No subtle winks and nods were needed. Russo straight up asked Terry to deny the bank's motions for summary judgment in the two cases, and with Terry's tape-recorded reply ("Got it." Gov't Ex. 117), Terry agreed to do just that. And he did, within hours of the conversation. Here is the timeline: Terry and Russo spoke at 11:58 a.m. on July 17; Terry called the magistrate later that afternoon, around 12:30 p.m.; and Terry called Russo at 10:31 a.m. the next morning to confirm he had denied the motions. Without reading the motions, without consulting the case files and without relying on the recommendation of anyone—within the court system—who had read the files, Terry did just what Russo asked. That is not an everyday occurrence in the judicial branch, and a jury could readily infer that Terry's unusual behavior, along with the other evidence, stemmed from an agreement to use his position as a public official to do Russo's bidding in return for Russo's financial, campaign and staff support.

In the face of this evidence, Terry claims that the record nonetheless does not establish an agreement between him and Russo to exchange campaign contributions and

help for official acts.  Yes and no.  Yes, the government never presented a formal agreement between Russo and Terry stating that Russo's gifts would control Terry's actions.  But no, there was ample evidence for the jury to infer that an agreement nonetheless existed between the two men.

Not every campaign contribution, we recognize, is a bribe in sheep's clothing. Without anything more, a jury could not reasonably infer that a campaign contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor.  *See, e.g., McCormick*, 500 U.S. at 272.  But when a public official acts as a donor's marionette—by deciding a case to a donor's benefit immediately after the donor asks him to and without reading anything about the case—a jury can reject legitimate explanations for a contribution and infer that it flowed from a bribery agreement.  Here, the jury rejected any legitimate explanation for Russo's contributions in the face of strong circumstantial evidence that Terry and Russo had a corrupt bargain. Once the jury found Terry and Russo had an agreement, it could easily find that Terry accepted a bribe, violating the honest services fraud statute along the way.  The same holds true for Terry's conspiracy conviction.

III.

For these reasons, we affirm.