CIKLIN, J.
The state appeals the trial court’s dismissal of all charges against the defendant, Beth Flansbaum-Talabisco (hereinafter “Talabisco”). We find that the undisputed facts upon which the state will rely in an attempt to prove Talabisco guilty establish a prima facie ease and thus dismissal was improper. Likewise, the determination of intent is a question for the trier of fact that is generally not appropriate for resolution on a motion to dismiss. We therefore reverse the order of dismissal and remand with instructions that the charges be reinstated. We caution that our decision should not be construed as a comment on whether Talabisco is guilty or not guilty of the crimes charged by the state attorney. We also take this opportunity to construe and discuss Florida’s anti-corruption statutes.
In 2011, the state charged Talabisco, the mayor of Tamarac, Florida, with four counts: unlawful compensation (count I), bribery (count II), official misconduct (count III), and conspiracy to commit unlawful compensation (count IV). The state alleged that Talabisco received financial assistance in her mayoral campaign from two developers in exchange for her favorable vote to approve their highly controversial development project after the election. The development encompassed the conversion of a golf course into a residential community and drew vocal advocates both for and against the plan. Talabisco responded by filing a sworn motion to dismiss, pursuant to Florida Rule of Criminal Procedure 3.190(c)(4), arguing that the undisputed facts did not establish a prima facie case of guilt.

The Motion to Dismiss

In her sworn motion, Talabisco asserted the undisputed facts to be as follows. In 2006, Talabisco was running for the office of mayor of the City of Tamarac, with the election being held on March 14, 2006. Bruce Chait and his son, Shawn Chait, owned a company, Prestige Homes of Ta-marac, Inc., which sought government approval to build a residential housing development (the “project”) within the City of Tamarac. Accordingly, the project required the approval of the Tamarac City Commission. Prior to the election and before providing assistance to the Talabis-co campaign, the Chaits believed that Tala-bisco was in favor of the project and would vote in favor of it. Bruce Chait knew Talabisco was “on board” for the project and would support it when it came before *571 the commission. Shawn Chait recognized that Talabisco’s support for the project was clear from the beginning of his involvement in her campaign but both Chaits wanted to be part of the effort to ensure Talabisco’s election and show support.
According to the motion to dismiss, in February of 2006, Shawn Chait met with lawyer/lobbyist Alex Heckler, political operative Russell Oster, and another individual to discuss ways in which Shawn Chait could get involved in the Tamarac mayoral race to influence the outcome. Heckler specialized in establishing electioneering communications organizations (“ECOs”).[1] Oster suggested conducting a poll, which Shawn Chait agreed to pay for, to assist in determining if Talabisco was doing well in the campaign and “get the lay of the land.” The poll would determine what campaign strategies would be necessary to support Talabisco’s election. Oster conducted the poll and the results showed that Talabisco was tied with her opponents.
As a result of the poll’s findings, the Chaits decided to create and fund an ECO to campaign for Talabisco. Heckler received a phone call from a friend of Tala-bisco’s instructing him to create the ECO and alerting Heckler that he would receive a phone call from Shawn Chait. Heckler created the ECO, named “Tamarac Residents for Good Government,” and the Chaits financially contributed to it via two “conduit entities,” which the Chaits later reimbursed, to create political advertisements including campaign flyers.
Talabisco claimed that her vote for the project was never contingent upon the Chaits’ financial support of her mayoral campaign. Talabisco further claimed that she “received no payment, financial benefit, or anything of value from the Chaits.” Talabisco asserted that only her campaign and the ECO received benefits.
In her motion to dismiss, Talabisco argued:
The legal and factual linchpin underlying the State’s case is that the Defendant obtained an illegal benefit from the Chaits. Simply put, without proof of an illegal benefit, the State’s case fails as a matter of law. Even viewing the evidence in the light most favorable to the State, the Defendant received no benefit or any other thing of value as required by law.

The State’s Traverse and Response

The state filed a traverse and response to Talabisco’s motion to dismiss, arguing both that material facts were in dispute and that the facts established a prima facie case for each of the four counts. The state contended that whether Talabisco’s vote for the Chaits’ project was in exchange for financial support for her campaign was a question of intent, which should be decided by a jury. The state urged that Talabisco received the benefits of a campaign poll (valued at more than $7,000) and campaign mailers (worth over $19,000) which were primarily negative attack ads coordinated against Talabisco’s opponents.
The state provided its own additional facts. According to the state, Talabisco’s support for the project was not a foregone conclusion, as she had previously met with *572 and ■ convinced a Tamarac resident who opposed the project that Talabisco opposed the project as well. Because the resident believed Talabisco’s opposition to the project to be genuine, the resident assembled a group of volunteers to hand out 1500 flyers (that the Talabisco campaign supplied) which claimed Talabisco would not “bow to developers” as mayor. The flyers were distributed within the project’s neighboring Mainlands community and contained language which assured Mainlands’ residents that Talabisco would stand up against Prestige Homes. The state further alleged that at some point Talabis-co was worried about the perception created by the Chaits’ support for her campaign and she therefore returned contributions that had been made in the Chaits’ names. The flyer distributed within the Mainlands community extolled that Talabisco was the “FIRST AND ONLY Mayoral Candidate to offer to refund campaign contributions to the Developer! [sic]”
Talabisco was elected to the office of mayor of Tamarac on March 14, 2006. At her first meeting as mayor — on March 22, 2006 — the Tamarac City Commission was scheduled to take its first vote on the Chaits’ project. Talabisco wanted to delay the vote but Bruce Chait told her not to delay it. On the day of the vote, Talabis-co’s support for the project appeared to be wavering. During a break in the meeting, Bruce Chait sent Talabisco’s former campaign manager to speak to Talabisco to make sure she voted for the project. The vote on the project was not delayed and Talabisco voted to approve the development.

The Order of Dismissal

After holding a hearing on the motion, the trial court entered an order dismissing all four charges against Talabisco. The court held that “the undisputed facts do not establish a prima facie case of guilt against the Defendant as to the crimes charged in the Information.” The court further held that the facts did not demonstrate that Talabisco received any “pecuniary or other benefit not authorized by law.”
The trial court found that it was undisputed that the Chaits wanted to support candidates for office in Tamarac who would vote for the project and that Tala-bisco supported the project before she met the Chaits. The trial court noted, “The evidence that at times her support wavered, is speculative and insufficient to show that she changed her position, and voted for the project because her vote had been purchased by the Chaits.”
The court concluded that “[t]here is no evidence that Beth Flansbaum-Talabisco benefitted [sic] personally in any manner” and noted that donors often seek out candidates for office who agree with them on policy issues. The court held, “This does not equate to ... candidate[s] selling their vote, and they are not prosecuted for unlawful compensation, bribery, or official misconduct, because they maintain their position and vote accordingly.”

The Charges

The first count against Talabisco was for unlawful compensation or reward for official behavior, which is defined under section 838.016(1), Florida Statutes (2010):
It is unlawful for any person corruptly to give, offer, or promise to any public servant,- or, if a public servant, corruptly to request, solicit, accept, or agree to accept, any pecuniary or other benefit not authorized by law, for the past, present, or future performance, nonperformance, or violation of any act or omission which the person believes to have been, or the public servant represents as having been, either within the official discretion of the public servant, in violation of a public duty, or in performance of a *573 public duty. Nothing herein shall be construed to preclude a public servant from accepting rewards for services performed in apprehending any criminal.
§ 838.016(1), Fla. Stat. (2010).[2]
Section 838.015(1), Florida Statutes (2010), contains the definition for bribery, the second count against Talabisco:
“Bribery” means corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept for himself or herself or another, any pecuniary or other benefit not authorized by law with an intent or purpose to influence the performance of any act or omission which the person believes to be, or the public servant represents as being, within the official discretion of a public servant, in violation of a public duty, or in performance of a public duty.
§ 838.015(1), Fla. Stat. (2010). The state’s information alleged that Talabisco committed unlawful compensation and bribery by corruptly requesting, soliciting, accepting, or agreeing to accept money from the Chaits to pay for a poll and the ECO in exchange for Talabisco’s voting favorably for the Chaits’ project.
Finally, count three against Talabisco, official misconduct, is defined as:
(1) It is unlawful for a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, to:
[[Image here]]
(c) Obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant.
§ 838.022, Fla. Stat. (2010). The state’s information accused Talabisco of committing official misconduct by failing to disclose that she had been financially aided by the Chaits during her campaign in exchange for her favorable vote for their project, constituting the felonies of bribery and unlawful compensation.

Analysis

Motion to Dismiss
“This court reviews de novo an order on a motion to dismiss.” Knipp v. State, 67 So.3d 376, 378 (Fla. 4th DCA 2011) (citation omitted). Florida Rule of Criminal Procedure 3.190(c)(4) provides that a defendant may advance a motion to dismiss the charges when “[tjhere are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant.” Fla. R. Crim. P. 3.190(c)(4). The rule then permits the state to traverse or demur the factual allegations contained in the motion to dismiss. Fla. R. Crim. P. 3.190(d).[3] The rule specifically mandates that “[a] motion to dismiss under subdivision (c)(4) of this rule shall be denied if the state files a traverse that, with specificity, denies under oath the material fact or facts alleged in the motion to dismiss.” Id. Thus, the defendant has the initial burden to demon- *574 strate in the motion to dismiss that the undisputed facts do not establish a prima facie case of guilt; the burden then shifts to the state to demonstrate either that material facts are actually in dispute or that the undisputed facts amount to a pri-ma facie case of guilt. See State v. Parrish, 567 So.2d 461, 464 (Fla. 1st DCA 1990) (“The burden of going forward with a motion to dismiss rests upon the accused, who must allege under oath that the material facts are undisputed, describe the material undisputed facts, and demonstrate that the undisputed facts fail to establish a prima facie case, or that the facts establish a valid defense.” (citations omitted)).
“The function of a ‘(c)(4)’ motion to dismiss is to ascertain whether or not the facts which the State relies upon to constitute the crime charged, and on which it will offer evidence to prove it, do, as a matter of law, establish a prima facie case of guilt of the accused.” State v. Upton, 892 So.2d 1013, 1015 (Fla. 5th DCA 1981) (citation omitted). “The purpose of such a motion is to test the legal sufficiency of the underlying case, i.e. whether there is a dispute of material fact (not just a dispute of unsupported conclusory allegations) .... ” State v. Nunez, 881 So.2d 658, 660 (Fla. 3d DCA 2004) (citations omitted); see also State v. A.R.R., 113 So.3d 942, 944 (Fla. 5th DCA 2013) (“Motions to dismiss criminal charges are treated like summary judgment motions in civil cases, the purpose of which is to test the legal sufficiency of the underlying case.” (citations omitted)).
It is well-established that “[s]o long as the state shows the barest prima facie case, it should not be prevented from prosecuting.” State v. Eugui, 60 So.3d 1185, 1186 (Fla. 4th DCA 2011) (citation and quotation marks omitted). “To survive a motion to dismiss, the state need not produce evidence sufficient to sustain a conviction.” Id. at 1185 (citation and quotation marks omitted). Further, “[a] motion to dismiss should rarely be granted, and granted only when the facts and inferences arising there from, taken in the light most favorable to the State, do not establish a prima facie case.” State v. Gensler, 929 So.2d 27, 29 (Fla. 3d DCA 2006) (citations omitted); see also State v. Santiago, 938 So.2d 603, 605 (Fla. 4th DCA 2006) (noting that in reviewing a motion to dismiss criminal charges “the court must draw all inferences in favor of the state and against the defendant” (emphasis added) (citation and quotation marks omitted)).
The state’s traverse attempted to dispute multiple facts Talabisco alleged in her motion to dismiss, although most of the state’s traverse merely addressed the wording of Talabisco’s asserted facts and not a substantive disagreement over material allegations. The state, however, squarely disputed material facts alleged by Talabisco related to the receipt of a “benefit” under chapter 838 and whether Tala-bisco accepted the benefit in exchange for her performance as a public servant.
“Benefit”
Talabisco argues on appeal that she never received a “benefit” as required for each of the charged crimes. She maintains that the poll and the contributions to her election efforts were not benefits to her personally. We find, however, that the definition of “benefit” under chapter 838 is quite broad:
“Benefit” means gain or advantage, or anything regarded by the person to be benefited as a gain or advantage, including the doing of an act beneficial to any person in whose welfare he or she is interested, including any commission, gift, gratuity, property, commercial interest, or any other thing of economic value not authorized by law.
*575 § 838.014(1), Fla. Stat. (2010). Defining “benefit” as simply “gain” or “advantage” plainly encompasses much more than the narrow economic benefit flowing directly into the recipient’s hands which Talabisco argues is the only type of “benefit” contemplated under these statutes.
In Bauer v. State, this court held that “[a] void anee of punishment is a benefit for purposes of official misconduct.” 609 So.2d 608, 611 (Fla. 4th DCA 1992) (citing Barr v. State, 507 So.2d 175, 177 (Fla. 3d DCA 1987)). The defendant, the cash management coordinator for the City of West Palm Beach, had improperly invested money belonging to the city which resulted in a loss of approximately $1 million. Bauer lied at multiple points to conceal the losses to achieve a “benefit” which this court found actionable for purposes of the official misconduct statute. Id. at 609. Bauer clearly did not financially gain from his unauthorized transactions and yet this court concluded that he benefited in his deliberate and prolonged efforts to cover up his misconduct.
Thus, contrary to Talabisco’s argument, the definition of “benefit” in chapter 838 is broad enough to include receiving assistance in her election effort. The poll conducted and mailers created and distributed were to Talabisco’s “advantage” and she cannot reasonably contend that she did not “gain” from them.
“Not Authorized By Law”
Talabisco also argues that the ECO contributions were not benefits which were “not authorized by law” under the anti-corruption statutes. Reviewing the legislative history of these statutes, we are not persuaded by this argument.
In 1974, the Florida Legislature enacted section 838.015, which defined the crime of bribery:[4]
“Bribery” means corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept for himself or another, any pecuniary or other benefit with an intent or purpose to influence the performance of any act or omission which the person believes to be, or the public servant represents as being, within the official discretion of a public servant, in violation of a public duty, or in performance of a public duty.
§ 838.015(1), Fla. Stat. (1974); see also ch. 74-383, § 60, at 1253, Laws of Fla. The crime of bribery was originally a third-degree felony. Id. With the exception of a revision to conform with changes in the felony classifications a year later, ch. 75-298, § 35, at 1095, Laws of Fla., and a revision in 1997 to use gender-neutral wording, ch. 97-102, § 1314, at 1466-67, Laws of Fla., the definition of bribery in Florida remained unchanged for nearly thirty years.
In 2003, however, the Legislature made a significant change to the bribery statute: It upgraded bribery from a third-degree felony to a second-degree felony. Ch. 2003-158, § 3, at 1027-28, Laws of Fla. Under House Bill 847, entitled “Citizens’ Right to Honest Government,” the Legislature merged the definitions of “benefit” and “pecuniary benefit,” which had previously been separately defined. Further, the bill created new anti-corruption laws and moved others into chapter 838. The bill also repealed the offenses of commercial bribery receiving and commercial bribery, both of which had already been *576 declared unconstitutional by the Florida Supreme Court.
Nowhere in HB 847 was there a proposition to make any other fundamental alterations to Florida’s almost thirty-year-old definition of bribery. By all objective indicators, the purpose of HB 847, evinced by its very title, “Citizens’ Right to Honest Government,” was to strengthen and reiterate Florida’s commitment to combat public corruption-not weaken it.
Nevertheless, at some point during the legislative process, four words were added to the bribery statute, which now reads (new language in italics):
“Bribery” means corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept for himself or herself or another, any pecuniary or other benefit not authorized by law with an intent or purpose to influence the performance of any act or omission which the person believes to be, or the public servant represents as being, within the official discretion of a public servant, in violation of a public duty, or in performance of a public duty.
§ 888.015(1), Fla. Stat. (2003) (emphasis added). Talabisco essentially argues that the Legislature’s addition of those four words — “not authorized by law” — was intended to create a fundamental and dramatic change in Florida’s statutory definition of bribery.
A primary rule of statutory construction advises that “[w]hen the Legislature makes a substantial and material change in the language of a statute, it is presumed to have intended some specific objective or alteration of law, unless a contrary indication is clear.” Punsky v. Clay Cnty. Bd. of Cnty. Com’rs, 60 So.3d 1088, 1092 (Fla. 1st DCA 2011) (citation and quotation marks omitted). We believe this rule is not applicable to the instant controversy, however, because the addition of the words “not authorized by law” was not meant to constitute a substantial and material change to the bribery statute. And its addition has a simple explanation: conformity with other existing language in chapter 838.
In 1974, when the Legislature enacted the modern offense of bribery, it also enacted the separate but related crime of “Unlawful compensation or reward for past official behavior,” defined then as:
It is unlawful for any person corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept any pecuniary or other benefit not authorized by law, for the past performance of any act or omission which the person believes to have been, or the public servant represents as having been, either within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty. Nothing herein shall be construed to preclude a public servant from accepting rewards for services performed in apprehending any criminal.
§ 838.016(1), Fla. Stat. (1974) (emphasis added); see also ch. 74-383, § 60, at 1253-54, Laws of Fla.
Save for a few minor changes, this definition has been maintained since its enactment. Thus, the crime of unlawful compensation has always included the words, “not authorized by law,” now found in the bribery statute. It appears possible that in 2003, when Florida’s anti-corruption statutes were being overhauled and consolidated, the Legislature merely added the “not authorized by law” language to the bribery statute in an effort to create uniformity between the unlawful compensa *577 tion and bribery statutes.[5]
At no point in the decades since the Legislature codified this definition of unlawful compensation has any Florida court reasoned that financial campaign assistance could not fall under the definition of that crime because campaign contributions are authorized by law. Likewise, since 2003 when the Legislature tweaked the bribery statute and added the “not authorized by law” language, no Florida court has held that campaign contributions could not constitute bribery because they are authorized by law.
It is true that “a basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless.” Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 198-99 (Fla.2007) (citation and quotation marks omitted). However, another important rule of statutory construction necessarily governs here: “ ‘We have long held that the Court should not interpret a statute in a manner resulting in unreasonable, harsh, or absurd consequences.’ ” Diamond Aircraft Indus., Inc. v. Horowitch, 107 So.3d 362, 371 (Fla.2013) (quoting Fla. Dep’t of Envtl. Prot. v. ContractPoint Fla. Parks, LLC, 986 So.2d 1260, 1270 (Fla.2008)). In rare circumstances, even the plain meaning of a statute which produces patently absurd results will be avoided. See Maddox v. State, 923 So.2d 442, 448 (Fla.2006) (noting that while the “strict meaning of the words ... employed by the Legislature” may support the lower court’s statutory reading, “such a sterile literal interpretation should not be adhered to when it would lead to absurd results” (citation omitted)). When the application of these two rules is irreconcilable (that is, when an interpretation that does not render any portion of a statute meaningless produces an absurd result), then it must be determined which rule becomes more imperative.
It is not difficult to conceive of scenarios in which behavior that would otherwise be considered bribery would become entirely legal were we to adopt Talabisco’s suggested interpretation of the revised bribery statute. For example, one could sell a piece of real property valued at $500,000 to a politician for a substantial discount, say $100,000, in exchange for a favorable vote on a matter. Because one is authorized to sell a piece of owned real estate for any price at the seller’s discretion, the discounted property is not a “benefit not authorized by law,” and therefore this scenario could never constitute bribery under the proposed reasoning.
As another example, a business owner who seeks a low interest government loan from a highly competitive taxpayer supported program could sell the official with final decision-making authority vast amounts of goods at or below the owner’s cost. Because the business owner is legally authorized to unilaterally establish his own price points, the government official receiving the goods could not be guilty of bribery even if the loan were approved as a result of his receiving the discounted pricing.
Thus, because Talabisco’s statutory interpretation of the bribery statute could lead to absurd results, the need to avoid such results necessarily takes priority over the otherwise important goal of not rendering any portion of the statute meaningless.
*578 Finally, the rule of lenity, which requires courts to interpret statutory ambiguity in favor of a defendant, is also unhelpful here. It is a “canon of last resort,” only to be used “when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.” Kasisehke v. State, 991 So.2d 803, 814 (Fla.2008) (citing and quoting United States v. Shabani, 513 U.S. 10, 17, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994)). This rule need not be applied because the ambiguity in the statute can be resolved by looking to legislative history and other traditional rules of statutory construction.

The Necessary Quid Pro Quo

Having concluded that the poll and flyers constituted an illegal benefit, we address the remaining question: whether Ta-labisco obtained the benefit in exchange for an affirmative public policy vote. This is an issue of intent and therefore most appropriate for the fact-finder to resolve. As we noted in State v. Hart, 677 So.2d 385, 386 (Fla. 4th DCA 1996), “Motive and intent are states of mind usually inferred from the conduct of the parties and the surrounding circumstances; they are questions for the trier of fact that are generally not appropriate for a motion to dismiss.” See also State v. Major, 30 So.3d 608, 610 (Fla. 4th DCA 2010) (“Determining the intent of the defendant should be left to the trier of fact and is therefore not the proper subject of a motion to dismiss.” (citations omitted)).
We are cognizant of the fact that the line between a legitimate and innocent campaign donation and one engineered to bribe a public official can at times be difficult to discern. As the Sixth Circuit recently explained in United States v. Terry, 707 F.3d 607 (6th Cir.2013):
Not every campaign contribution, we recognize, is a bribe in sheep’s clothing. Without anything more, a jury could not reasonably infer that a campaign contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor.
Id. at 615 (citation omitted).
Therefore, we find wisdom in the federal law requirement that an explicit quid pro quo is necessary for a conviction under corruption-related statutes when a government representative accepts a campaign contribution. As the Fifth Circuit Court of Appeals reasoned in United States v. Dozier, 672 F.2d 531, 537 (5th Cir.1982):
A moment’s reflection should enable one to distinguish, at least in the abstract, a legitimate solicitation from the exaction of a fee for a benefit conferred or an injury withheld. Whether described familiarly as a payoff or with the Latinate precision of quid pro quo, the prohibited exchange is the same: a public official may not demand [or accept] payment as inducement for the promise to perform (or not to perform) an official act.
The Eleventh Circuit further elaborated on this point in United States v. Siegelman, 640 F.3d 1159 (11th Cir.2011):
No generalized expectation of some future favorable action will do. The official must agree to take or forego some specific action in order for the doing of it to be criminal.... In the absence of such an agreement on a specific action, even a close-in-time relationship between the donation and the act will not suffice.
Id. at 1171 (emphasis added).
That said, “there is no requirement that this [quid pro quo ] agreement be memorialized in a writing, or even ... be overheard by a third party.” Id. Although “the agreement must be explicit ... there is no requirement that it be express.” Id. “To hold otherwise ... would allow defendants to escape criminal liability through ‘knowing winks and nods.’ ” Id. (quoting Evans v. United States, 504 U.S. 255, 274, *579 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992) (Kennedy, J., concurring)). Further, a jury “is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.” Evans, 504 U.S. at 274, 112 S.Ct. 1881 (Kennedy, J., concurring). Moreover, “[a]s most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess.” Terry, 707 F.3d at 613. As the Sixth Circuit recently explained in Terry;
That a bribe doubles as a campaign contribution does not by itself insulate it from scrutiny. No doubt, a contribution is more likely to be a duty-free gift than a bribe because a contribution has a legitimate alternative explanation: The donor supports the candidate’s election for all manner of possible reasons. But the prosecution may rebut that alternative explanation, and context may show that an otherwise legitimate contribution is a bribe.
Id. (citation omitted).
Based on the foregoing, we believe the state in the instant case is entitled to the opportunity to explain this context to a jury, so it can determine whether the otherwise legitimate contribution was in fact a bribe, unlawful compensation and official misconduct.

Conclusion

At its core, the issue before us is whether or not, as a matter of law, the state has established a prima facie case. If so, as we have found, the state should not be prevented from exercising its prosecutorial discretion. Accordingly, we reverse the order of dismissal and remand the cause with directions to reinstate the charges against Talabisco.

Reversed and remanded with instructions.

STEVENSON and GERBER, JJ., concur.
GERBER, J., concurs specially with an opinion.

. Section 106.011(19), Florida Statutes (2012), defined an ECO as:
[A]ny group, other than a political party, affiliated party committee, political committee, or committee of continuous existence, whose election-related activities are limited to making expenditures for electioneering communications or accepting contributions for the purpose of making electioneering communications and whose activities would not otherwise require the group to register as a political party, political committee, or committee of continuous existence under this chapter.

. The state charged Talabisco with conspiracy to commit unlawful compensation as well.

. The state is also permitted to assert additional facts if they would create a material issue preventing the granting of the motion. See State v. Kalogeropolous, 758 So.2d 110, 112 (Fla.2000) (“If the facts in the motion that the State does not specifically deny support the defendant’s position but additional facts exist that would create a material issue preventing the granting of the motion, the State should set forth those additional facts in the traverse just as a non-movant would have to do in a counter-affidavit in order to defeat a motion for summary judgment." (citations omitted)).

. The Florida Statutes contained a much more complex definition of bribery from 1955 until 1974. See § 838.011, Fla. Stat. (1955).

. The "Citizens’ Right to Honest Government Act” (House Bill 847) was a comprehensive bill, comprised of fourteen pages and contain-tag ten sections relating to dozens of statutes and subsections. See ch. 2003-158, §§ 1-10, 1026-39, Laws of Fla.